**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| CAFE AGAVE, INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 1:23-cv-32 |
| ) | |
| v. ) | |
| ) | |
| CROWN VALLEY WINERY, INC.; and DOES ) | **JURY TRIAL DEMAND** |
| 1-10, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

COMES NOW, Plaintiff Cafe Agave, Inc., ("Cafe Agave"), by and through its undersigned

counsel, and for its claims and causes of action against Defendants states and alleges as follows:

## PARTIES

1.      Plaintiff Cafe Agave is a Delaware corporation, with its principal place of business

in San Diego, California.

2.      Defendant, Crown Valley Winery, Inc., ("Crown Valley" or "Defendant") is a

Missouri for-profit corporation with its principal place of business in Missouri at 23589 State

Route WW, Ste. Genevieve, Missouri 63670.

3.      The true names or capacities, whether individual, corporate, associate or otherwise,

of Defendants DOE 1 to DOE 10 are unknown to Cafe Agave, who therefore sues such Defendants

by such fictitious names.  Cafe Agave will amend this Complaint to substitute their true names and

capacities for these fictitious names when ascertained.  Cafe Agave is informed and believes and

thereon alleges that the Defendants designated as DOES are responsible in some manner for the

1

occurrences referred to herein and thereby proximately caused injuries and damages to Cafe Agave as herein alleged.

4.     Cafe Agave and Crown Valley entered into a Tolling and Standstill Agreement ("Tolling Agreement") on August 5, 2022, which was set to expire on November 1, 2022. The Tolling Agreement suspended the running of all statutes of limitations, statutes of repose, doctrines of laches, contract limitations periods, and other periods of limitations applicable to claims and causes of actions the parties may have against each other.  On October 11, 2022, the parties entered into a First Amended Tolling and Standstill Agreement which extended the tolling period until February 28, 2023.

## JURISDICTION AND VENUE ALLEGATIONS

5.     Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391 because the substantial part of the events giving rise to Plaintiff's claims occurred in this district.

6.     The Manufacturing Agreement ("Agreement") entered by the parties by which Cafe Agave's Cold Spiked Brew beverages and that are the subject of this matter states that the exclusive venue for any action related to the Agreement, or its enforcement, shall be the state and federal courts having jurisdiction over Ste. Genevieve, Missouri.

7.     Cafe Agave's Cold Spiked Brew beverages that are the subject of this matter were produced and contaminated by Crown Valley at its Winery facility located in Ste. Genevieve, Missouri.

8.     Because of the foregoing, jurisdiction and venue of the causes of action hereinafter set forth are proper in this U.S. District Court based upon diversity of citizenship under 28 U.S.C. § 1332(a) as Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000.00.

2

## ALLEGATIONS COMMON TO ALL COUNTS

9.      Cafe Agave develops and markets canned flavored cold brew coffee beverages spiked with alcohol.

10.     Crown Valley Winery produces, manufacturers, and packages various alcoholic beverages, including its own line of wines and ciders.

11.     Crown Valley produced several lots of Spiked Cold Brew beverages for Cafe Agave.

12.     On or about November 2018, Cafe Agave was forced to withdraw, destroy and/or advise its customers to dispose of all lots -- approximately 14,294 cases -- of its Spiked Cold Brew beverages that were canned by Crown Valley.  This action was taken because the beverages were coagulating due to contamination with an alcohol-resistant *pediococcus acidilactici* bacterium.

13.     The contamination and Cafe Agave's ensuing damages resulted directly from Crown Valley's willful misconduct and concealment of its contamination of the products with known wine spoilage microorganisms.

### Crown Valley's Production of L&F Brands' Iced Coffee Product

14.     L&F Brands had its cream-based El's Iced Coffee and Chocolate alcoholic beverage products produced at Crown Valley immediately before the Cafe Agave production. Crown Valley produced the first run of the El's Iced Coffee and Chocolate alcoholic beverage products between July 14, 2018, and August 24, 2018.  During this production, L&F's products were mis-blended and contaminated with and eventually coagulated due to the same ethanol-resistant *pediococcus acidilactici* that was later determined to have contaminated Cafe Agave's product.

3

15.     Although Crown Valley had previously produced L&F's products without incident, this was the first time that L&F's beverages were produced at Crown Valley's Winery building instead of its Champagne House.  The fact that the contamination of the L&F product occurred only after production was moved to the Winery building indicates that the contamination was associated with the lack of sanitary conditions at the Winery building.

16.     The contamination of L&F's product was one of the grounds upon which L&F pursued litigation in federal court against Crown Valley.  (*See L&F Brands, Inc. v. Crown Valley Winery, Inc*., Case No. 1:19-cv-00134 (E. D. Missouri)).  In that case, L&F alleged that Crown Valley knowingly produced the L&F product in unsanitary conditions and without the use of good manufacturing practices.

17.     Crown Valley terminated its master winemaker, Alwyn Dippenaar, in relation to the failure of the L&F products.

**Cafe Agave's Referral to and Qualification of Crown Valley**

18.     Cafe Agave was referred to Crown Valley by Galloway Company ("Galloway") based on Crown Valley's apparent knowledge and expertise in producing and canning alcoholic-cream-based beverage products.

19.     Following the referral, Cafe Agave sought to qualify Crown Valley as an appropriate co-packer for its Spiked Cold Brew beverages.  During that process, Crown Valley presented Cafe Agave with its standard Quality Assurance Program ("QAP") that it adhered to in the production of beverages.  The QAP included, without limitation, procedures for performing full clean-in-place and sanitation processes before and after every day of production, "Scorpion" Yeast & Bacteria Panel testing of its storage tanks for bacteria and yeast, taking ATP Bacteria Detection "swabs" during each step of the production process, and sending samples of beverages

4

for each day of production to ETS Laboratories for "Scorpion" testing.  Crown Valley emphasized that the ETS lab testing was mandatory.  Crown Valley relayed its standard QAP to Cafe Agave, which included the representation that "[w]e are unable to deviate from this schedule because we are dedicated to bringing you're [*sic*] a quality product every single time."

### The Manufacturing Agreement

20.     The parties entered into a Manufacturing Agreement (the "Agreement") on August 28, 2018.  Unbeknownst to Cafe Agave when it entered the Agreement, Crown Valley did not have the represented standard QAP in place that it would adhere to, including the "Scorpion" testing of the finished products.  Crown Valley's intentional misrepresentations about its QAP were made by Crown Valley to fraudulently induce Cafe Agave to enter the Agreement and Crown Valley's failure to adhere to its QAP was a substantial factor in causing Cafe Agave's damages.  As such, all continuing requirements of the Agreement, if any, are voidable by Cafe Agave including any limitations on remedies and damages available to Cafe Agave.

21.     The Agreement provided, among other conditions, that Crown Valley would produce and package wine or wine-related products for Cafe Agave according to Cafe Agave's incorporated specifications for each of the four flavors of its Spiked Cold Brew alcoholic beverages, including Espresso Wine, Mocha Wine Specialty, Salted Carmel, and Vanilla Cinnamon.[1]  (Agreement at ¶¶ 2, 11, Exhibit A).  The ingredients of the beverages included an alcoholic cream base and grape wine.  The Agreement further required Crown Valley to utilize good manufacturing practices and use the same degree of care in making and storing the beverages that Crown Valley uses in making and storing its own products and in all events in accordance

---

[1] The specifications for each of the four Spiked Cold Brew beverage flavors indicated that the Standard Plate Count would be <1,000 cfu/g and yeast/mold <100 cfu/g.

5

with acceptable industry practices and Cafe Agave's specifications. (Agreement at ¶¶ 9, 11, Exhibit A). Crown Valley was further required to comply with all applicable laws in the performance of the Agreement. (Agreement at ¶15).

22.     The Agreement states that in the event of a dispute relating to Agreement, the enforcing and/or prevailing party shall be entitled to payment of its reasonable attorneys' fees and costs. (Agreement at ¶ 26).

### Crown Valley's Production of Cafe Agave's Spiked Cold Brew Beverages

23.     Cafe Agave's four Spiked Cold Brew beverages were produced by Galloway Company on the following dates: August 21, 2018 (Salted Caramel), August 21, 2018 (Vanilla Cinnamon), September 5, 2018 (Espresso Wine), and September 6, 2018 (Mocha Wine Specialty).

24.     Cafe Agave's beverages were delivered to Crown Valley's Winery building (the same building where L&F's product was contaminated) and transferred by Crown Valley into its tanks on August 24, 2018 (Salted Caramel, Tank 601), August 28, 2018 (Vanilla Cinnamon, Tank 602), September 9, 2018 (Mocha Wine Specialty, Tank 307 & Tank 301), and September 8, 2018 (Espresso Wine Specialty, Tank 601). The beverages were canned at Crown Valley's Winery building from August 29, 2018 to October 3, 2018.

25.     Crown Valley took retain samples of Cafe Agave's Salted Caramel and Vanilla Cinnamon beverages from its tanks on August 29 and August 30, 2018, respectively. However, despite commencing canning on August 29, 2018, and the representations made regarding its standard QAP, Crown Valley did not send samples of the finished canned products to ETS for testing from each day of production.

26.     Crown Valley sent the retain samples of the Salted Carmel and Vanilla Cinnamon flavors to ETS Laboratories on or about September 10, 2018. On September 11, 2018, Crown

Valley received the "Scorpion" panel test results indicating the presence of wine spoilage microorganisms in both flavors, including acetic acid bacteria, lactobacillus, pediococcus, *saccharomyces cerevisiae*, and the notorious wine spoiler *Zygosacchromyces bailli*. Particularly as to *Z. bailli*, it is noted in the literature that it can grow and cause spoilage from extremely low inocula, as few as one viable cell in $\geq 10$ liters of beverage. This means that the detection of even low numbers of these yeast cells in a product is concerning and signals the possibility that a product will fail. The presence of *Z. bailli* can also establish conditions in a medium that promote the growth of other microorganisms. Crown Valley invoiced Cafe Agave for this testing.

27.     On or about September 14, 2018, Crown Valley sent tank retain samples of the Vanilla Cinnamon, Espresso Wine, and Mocha Wine Specialty flavors to ETS for "Scorpion" testing and received the results on September 15, 2018. The testing demonstrated the presence of increased numbers of acetic acid bacteria and lactobacillus relative to the levels reported on September 11, 2018. With respect to the Vanilla Cinnamon, the levels of acetic acid bacteria increased from 30 cells/mL to 110,000 cells/mL. The levels of *lactobacillus plantarum/casei/mali* increased from 230 cells/mL to 2540 cells/mL. This further alerted Crown Valley to the presence of the wine spoilers in Cafe Agave's products, that they were proliferating even in the presence of approximately 12.5% alcohol and were alcohol resistant, and that there was a substantial danger they would cause the wine and cream-based beverages to decompose. Crown Valley invoiced Cafe Agave for this testing.

28.     The levels of both bacteria and yeast present as of September 15, 2018 also exceeded the agreed-upon specifications for Cafe Agave's products. The Vanilla Cinnamon flavor was out of specification based on the levels of acetic acid bacteria (110,000 cells/mL), lactobacillus (2540 cells/mL), and *saccharomyces cerevisiae* (140 cells/mL). The Mocha Wine Specialty (Tank

7

301) flavor was out of specification due to the levels of *Z. bailli* (290 cells/mL).  The Mocha Wine Specialty (Tank 307) flavor was out of specification due to the levels of acetic acid bacteria (4090 cells/mL) and *saccharomyces cerevisiae* (260 cells/mL).

29.     Despite receiving the above test results, Crown Valley did not disclose the results to Cafe Agave and continued knowingly canning the contaminated and out-of-specification beverages as scheduled until all canning was completed on October 3, 2018.  Crown Valley further failed to disclose the results to Cafe Agave when the parties met in the regular course on September 20, 2018, September 27, 2018, and thereafter.  In addition, Crown Valley continued to fail to send samples of the finished canned products to ETS for "Scorpion" testing.

30.     Cafe Agave did not learn that its Spiked Cold Brew beverages might be contaminated until October 2018, when it received the results of its own independent testing after all canning had been completed.  Cafe Agave immediately began to investigate the contamination and informed Crown Valley of the results.  Despite this communication, Crown Valley once again did not disclose the results of the ETS "Scorpion" testing it had received approximately one month earlier.

31.     At this time, Cafe Agave had an agreement in place with Pabst Brewing Company ("Pabst") to evaluate Cafe Agave Cold Spiked Brew beverages in test markets with the expectation, that if Cafe Agave could demonstrate that it had a manufacturing solution in place (liquid supplier and canner) by November 30, 2018 that Pabst wanted to move forward with a national roll out of the Cold Spiked Beverages and an associated 15-year agreement by which Pabst would license from Cafe Agave the exclusive right to distribute the Cold Spiked Brew beverages.

32.     Given that the beverages had already been canned and because Cafe Agave was facing a deadline in November 2018, it continued investigation of the contamination and hoped that the alcohol in the products would eventually eliminate the bacteria.  However, the Salted Caramel flavor began to coagulate and failed in late October 2018.  It was first thought that the failure may have been related primarily to Crown Valley's improper canning of this flavor.

33.     During a November 1, 2018 teleconference between Crown Valley, Cafe Agave, and Pabst, Crown Valley informed Cafe Agave that *Z. bailli* had been "picked up" in prior testing. Crown Valley did not, however, disclose whether the *Z. bailli* was detected in finished goods or in plant swabs.  Although Cafe Agave requested Crown Valley immediately provide the test results, Crown Valley did not send the ETS lab reports to Cafe Agave until November 29, 2018.

34.     Ultimately, and despite Cafe Agave's hope that the alcohol in the Vanilla Cinnamon, Mocha Wine Specialty and Espresso Wine flavors would eventually eliminate the contamination, all flavors coagulated and became unsaleable, and Cafe Agave was left with no option other than to destroy all 14,294 cases of its Spiked Cold Brew beverages.

35.     Due to the contamination of the Cold Spiked Brew beverages, Pabst declined to move forward with the national roll out of Cafe Agave's Cold Spiked Brew beverages and the 15-year licensing agreement with Cafe Agave.

### Cafe Agave's Spiked Cold Brew Beverages Were Contaminated at Crown Valley's Winery Building

36.     The bacteria found in the Spiked Cold Brew beverages, which ultimately proliferated to become the primary contaminant causing the beverages to coagulate, was an ethanol-resistant strain of the lactic acid bacteria *pediococcus acidilactici*.

37.     Retained samples of the Spiked Cold Brew beverages produced by Galloway in August 2018 and September 2018 were tested for their microbiological properties in November

2018.  The results of that testing demonstrated each sample was within the appropriate specifications for bacteria and yeast and that the beverages, as produced by Galloway and transported to Crown Valley, were not the source of the contamination.  In contrast, the same beverages that had been canned at Crown Valley's Winery were coagulated and ruined.

38.     In addition, it was later and independently discovered by Cafe Agave that the L&F product had also been contaminated with *pediococcus acidilactici*, that the *pediococcus acidilactici* similarly caused the L&F product to coagulate, and that the L&F production run occurred just prior to the canning of the Spiked Cold Brew beverages.  This indicates that bacteria present in the wine building during the L&F production run contaminated, just a short time later, Cafe Agave's Spiked Cold Brew beverages due to Crown Valley's failure to sanitize its facility following the L&F production.

### Crown Valley's Fraud and Willful Misconduct

39.     Given the parties' relationship, the requirements of the Agreement, Crown Valley's exclusive possession of the Cold Spiked Brew beverages, Crown Valley's knowledge and experience, and the ETS "Scorpion" test results demonstrating the beverages were contaminated, Crown Valley unquestionably had a duty to immediately disclose the results to Cafe Agave and to cease canning the beverages.  Crown Valley failed to do so and fraudulently concealed this information from Cafe Agave at a critical time early in the canning of Cafe Agave's products when, if the results had been disclosed, Cafe Agave could and would have taken steps to protect itself and its valuable distribution relationship with Pabst including, but not limited to, rejecting the products, terminating the Agreement, and having its beverages produced at another canner. Indeed, had this material information been disclosed, Cafe Agave would have had time to meet

10

Pabst's deadline of having established production relationships in place for the beverages by the end of November 2018.

40.     Instead of disclosing the "Scorpion" panel test results to Cafe Agave, Crown Valley knowingly continued canning Cafe Agave's contaminated and out of specification beverages and completed the canning on October 3, 2018.  The intentional nature of Crown Valley's concealment is clear as it failed to disclose the results of the testing even when the parties met in the regular course on September 20, 2018, September 27, 2018, and thereafter.  Crown Valley's intent to advance its own interests to the detriment of Cafe Agave was malicious.

41.     In addition, and as also discussed, Crown Valley fraudulently induced Cafe Agave to enter the Agreement knowing that it had no intention to collect daily samples of the finished canned beverages during the Cafe Agave production run and send them to ETS for "Scorpion" testing.  Had Crown Valley performed such testing, which it did not, and reported those results to Cafe Agave, the contamination in the Spiked Cold Brew beverages would have been discovered even earlier than September 11, 2018.

**Cafe Agave's Damages**

42.     As a direct result of Crown Valley's failure to properly sterilize its lines and/or its liquid storage tanks, its failure to conduct "Scorpion" testing of the finished canned beverages and otherwise adhere to its standard QAP, its knowing canning of contaminated and out of specification product and its knowing, intentional and/or reckless concealment of crucial and material facts in its sole possession, Cafe Agave's Spiked Cold Brew beverages were contaminated, coagulated, failed and were, therefore, not commercially viable.  Crown Valley's negligence, recklessness, fraud, willful misconduct, breach of contract and breach of warranty caused Cafe Agave damages, including the cost of lost goods, lost profits, costs of product

cancellation and destruction, attorneys' and professional fees and losses related to business interruption, including loss of a 15-year licensing agreement with Pabst, and, ultimately, the buyout by Pabst of the Cafe Agave brand.

## COUNT I

### (Fraudulent Concealment)

43.     Cafe Agave repeats, realleges, and incorporates by reference, each and every averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

44.     Crown Valley was in possession of Cafe Agave's four flavors of Cold Spiked Brew beverages as of September 9, 2018.  Crown Valley had a duty to disclose adverse test results regarding Cafe Agave's beverages due to its possession of Cafe Agave's beverages, its relationship with Cafe Agave as Cafe Agave's co-packer/co-manufacturer and because Crown Valley knew that the microbiological integrity of the products could have a direct impact on their commercial viability.  Crown Valley also had knowledge and experience that the presence of known wine spoilers, including *Z. bailli*, was of immediate concern for the integrity of a beverage.

45.     As of September 11, 2018, at the latest, Crown Valley was in possession of test results demonstrating that the Cold Spiked Brew beverages being stored in tanks at its facility were contaminated with known wine spoiler microorganisms.  As of September 15, 2018, at the latest, Crown Valley was in possession of test results demonstrating that the microorganisms were proliferating in the beverages even in the presence of 12.5% alcohol and were alcohol resistant and that the beverages were not compliant with Cafe Agave's specifications.

46.     Despite Crown Valley's exclusive possession of the beverages and the test results (for which Crown Valley invoiced Cafe Agave), and Crown Valley's duty to abide by good

manufacturing practices, accepted industry standards and to produce the beverages in compliance with Cafe Agave's specifications, Crown Valley knowingly and intentionally concealed from Cafe Agave the test results demonstrating that the beverages were contaminated and not compliant with Cafe Agave's specifications.  Crown Valley also knowingly and intentionally concealed from Cafe Agave that it was canning Cafe Agave's beverages even though they were contaminated and not compliant with Cafe Agave's specifications.

47.     The facts contained in the test results and the fact that Crown Valley was canning Cafe Agave's beverages even though they were contaminated and not compliant with Cafe Agave's specifications were in Crown Valley's exclusive possession were material, not within the fair and reasonable reach of Cafe Agave and Cafe Agave did not know of these concealed facts at the time they were obtained by Crown Valley.

48.      Crown Valley intended to deceive Cafe Agave by concealing the fact that it had contaminated the beverages so that it could continue canning the products without Cafe Agave immediately rejecting the beverages and, upon information and belief, for other reasons.  Despite having knowledge of the contamination, Crown Valley continued canning the beverages and completed the canning of all flavors on October 3, 2018.

49.     Cafe Agave relied upon Crown Valley's assurances that it was compliant with Cafe Agave's specifications and that Crown Valley would share any adverse testing results immediately upon learning same.

50.     Cafe Agave first learned that its Cold Spiked Brew beverages might be contaminated on or about October 10, 2018, after the canning was completed and after it received its own, independent test results.  The test results obtained by Cafe Agave were not "Scorpion" panel results demonstrating the presence of wine spoiler microorganisms. Despite immediately

13

informing Crown Valley of its results, Crown Valley continued to conceal the ETS "Scorpion" panel test results it received in September of 2018.

51.     Had Crown Valley disclosed the ETS test results to Cafe Agave at the time they were received and/or disclosed that it was canning Cafe Agave's products even though they were contaminated and not compliant with Cafe Agave's specifications before canning was completed, Cafe Agave could and would have taken steps to protect itself in time to meet Pabst's deadline to have a producer and canner in place by the end of November 2018.

52.     By the time Cafe Agave first became aware of the contamination, the beverages were canned, and it was also too late for Cafe Agave to take steps to protect itself, including steps it could and would have taken to meet Pabst's deadline.  At that point, Cafe Agave had no choice but to hope that the alcohol in the products would eliminate the contamination.

53.     It was not until November 1, 2018, that Crown Valley disclosed to Cafe Agave that *Z. bailli* had been "picked up" in prior testing.  Crown Valley did not, however, disclose whether the *Z. bailli* was detected in finished goods or in plant swabs.  And, despite Cafe Agave's request made on November 1, 2018, Crown Valley did not provide Cafe Agave a copy of the test results until November 29, 2018.

54.     The Salted Carmel flavor failed to due to coagulation caused by contamination with *pediococcus acidilactici* and was determined to not be commercially viable in late October 2018. The Vanilla Cinnamon, Mocha Wine Specialty and Espresso Wine flavors failed due to contamination with *pediococcus acidilactici* and was determined to not be commercially viable on November 15, 2018.  In total, 14,294 cases of Cafe Agave's Spiked Cold Brew beverages failed and were not commercially viable due to the contamination.

55.     As a direct and proximate result of Crown Valley's fraudulent concealment, Cafe Agave was damaged.

56.     The conduct of Crown Valley, in concealing material facts from Cafe Agave was intentional, malicious, outrageous, and done with reckless disregard of the consequences to Cafe Agave such as to warrant the award of punitive damages.

## COUNT II

### (Recklessness)

57.      Cafe Agave repeats, realleges, and incorporates by reference, each and every allegation, averment set forth in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

58.     Crown Valley owed a duty to Cafe Agave to comply to Cafe Agave's specifications and share test results with Cafe Agave as soon as Crown Valley became aware that the product had been contaminated as a result of Crown Valley's failure to comply with those specifications.

59.     Despite its duty to disclose the ETS test results to Cafe Agave, Crown Valley recklessly failed to provide Cafe Agave the ETS "Scorpion" panel test results demonstrating that Cafe Agave's Cold Spiked Brew beverages were contaminated and not compliant with Cafe Agave's specifications, even though Crown Valley knew that this information was vital to Cafe Agave.  Crown Valley also recklessly failed to inform Cafe Agave that it was canning Cafe Agave's beverages even though they were contaminated and not compliant with Cafe Agave's specifications.

60.     Crown Valley knew or had reason to know that its failure to provide Cafe Agave the ETS "Scorpion" panel test results demonstrating that the beverages were contaminated and not compliant with Cafe Agave's specifications and its failure to inform Cafe Agave that it was

canning Cafe Agave's beverages even though they were contaminated and not compliant with Cafe Agave's specifications involved an unreasonable risk and high degree of probability that substantial harm would result to Cafe Agave due to Crown Valley's acts and omissions.

61.    As a direct and proximate result of Crown Valley's reckless failure to provide Cafe Agave the ETS "Scorpion" panel test results demonstrating that the beverages were contaminated and not compliant with Cafe Agave's specifications and its failure to inform Cafe Agave that it was canning Cafe Agave's beverages even though they were contaminated and not compliant with Cafe Agave's specifications, Cafe Agave was damaged.

62.    The conduct of Crown Valley, in recklessly failing to provide material facts to Cafe Agave was outrageous and done with reckless disregard of the consequences to Cafe Agave such as to warrant the award of punitive damages.

## COUNT III

### (Fraudulent Inducement)

63.    Cafe Agave repeats, realleges, and incorporates by reference, each and every allegation, averment outlined in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

64.    During Cafe Agave's qualifying of Crown Valley as its co-packer/co-manufacturer and specifically in May, July and August of 2018, Crown Valley, including, but without limitation, its agents Bryan Siddle and Jeremy Gilbert, represented to Cafe Agave that it had a standard QAP in place that it adhered to for the production of beverages, including that samples of finished canned beverages were taken daily during each day of production and sent to ETS for Scorpion testing.  Crown Valley further represented that the ETS testing was mandatory per its standard QAP.  At the time Crown Valley made its representations, and unbeknownst to Cafe Agave, Crown

16

Valley made the representations knowing them to be false or with reckless disregard for their truth or falsity and Crown Valley did not have the represented standard QAP in place that it would adhere to for the production of beverages.

65.     Crown Valley made these misrepresentations during the qualification process knowing that the representations were material to Cafe Agave in determining whether to enter into the Agreement and with the intent to fraudulently induce Cafe Agave to enter into the Agreement.

66.     Cafe Agave reasonably relied on Crown Valley's representations that it had a standard QAP in place that it adhered to, including that samples of beverages would be taken daily during each day of production and sent to ETS for "Scorpion" panel testing.  Indeed, Crown Valley purported to have specialized experience and expertise in producing beverages and, in a May 24, 2018, email, provided Cafe Agave with written materials including its "Quality Assurance Program" and "ETS Lab Fees & Schedule" documents.  Crown Valley stated in the May 24, 2018, email that "[w]e take every step we can to insure your product is exactly what it should be, and we do this by having a Quality Assurance Program in Place."  The email further stated that "[y]ou will find a breakdown of the lab fees, as well as all the required lab testing.  We are unable to deviate from this schedule because we are dedicated to bringing you're [*sic*] a quality product every single time."  Crown Valley's representations were material.  Cafe Agave would not have entered into the Agreement without Crown Valley's representations that it had a standard QAP in place that it adhered to in producing beverages.  At the time Crown Valley's representations were made, Cafe Agave did not know Crown Valley's representation were false and had no reasonable independent means to ascertain their truth or falsity.  As a direct result of Crown Valley's misrepresentations, Cafe Agave was fraudulently induced into entering the Agreement and any continuing requirements of the Agreement are voidable by Cafe Agave.

67.     Crown Valley did not have a standard QAP in place that it adhered to including, but not limited to, taking samples of beverages during each day of production and sending them to ETS for "Scorpion" panel testing.  Crown Valley did not adhere to its standard QAP in producing Cafe Agave's beverages including failing to take samples of Cafe Agave's beverages during each day of production and sending them to ETS for "Scorpion" panel testing.

68.     Cafe Agave's beverages became contaminated while in Crown Valley's possession and the contamination was not detected in sufficient time for Cafe Agave to take steps to protect itself.  If Crown Valley would have had a standard QAP in place that it adhered to, Cafe Agave's products would not have become contaminated while in Crown Valley's possession and/or the contamination would have been detected in sufficient time for Cafe Agave to take steps to protect itself.

69.     As a direct and proximate result of Crown Valley's fraudulent inducement, Cafe Agave was damaged.

70.     The conduct of Crown Valley, in fraudulently inducing Cafe Agave, was intentional, malicious, outrageous and done with reckless disregard of the consequences to Cafe Agave such as to warrant the award of punitive damages.

## COUNT IV

### (Breach of Contract)

71.     Cafe Agave repeats, realleges, and incorporates by reference, each and every allegation, averment outlined in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

72.     Cafe Agave and Crown Valley entered into the Agreement on August 28, 2018.

18

73.     The Agreement imposed mutual obligations on both parties and valid consideration.  Cafe Agave agreed to place purchase orders with Crown Valley for Cafe Agave's Spiked Cold Brew beverages, and Crown Valley agreed to produce the beverages for Cafe Agave.

74.     Cafe Agave performed its obligations under the contract by placing purchase orders with Crown Valley for the production of the Spiked Cold Brew beverages, by providing specific formulas/specifications specified by Cafe Agave and approved by the TTB, and by providing payment in accordance with the Agreement to Crown Valley for the production of Cafe Agave's Spiked Cold Brew beverages.

75.     Under the Agreement, Crown Valley agreed, among other terms, to produce, blend, label, can and package Cafe Agave's Cold Spiked Brew beverages according to Cafe Agave's specifications, follow good manufacturing practices in the production of Cafe Agave's products, produce Cafe Agave's products in material accordance with all applicable laws and regulations dealing with the production, storage, distribution, and sale of products containing alcohol, and to use the same degree of care in making and storing the beverages that Crown Valley uses in making and storing its own products and in all events in accordance with acceptable industry practices and Cafe Agave's specifications.

76.     Crown Valley willfully, intentionally, and recklessly breached the Agreement by failing to produce and can Cafe Agave's Spiked Cold Brew beverages in accordance with Cafe Agave's specifications.  Crown Valley knew, at the time it was canning Cafe Agave's products, that the Cold Spiked Brew beverages were not in compliance with Cafe Agave's specifications.

77.     In addition, Crown Valley breached the Manufacturing Agreement by failing to produce the beverages in material accordance with good manufacturing practices, in accordance with all applicable laws and regulations, using the same degree of care in making and storing the

beverages that Crown Valley uses in making and storing its own products, and in accordance with acceptable industry practices.

78.     As a result of Crown Valley breaches of the Agreement, Crown Valley produced Cafe Agave's products in an unsanitary and non-sterile environment, the beverages became contaminated with known wine spoiler microorganisms while in Crown Valley's possession (including with microorganisms that had contaminated L&F's beverages), failed to meet Cafe Agave's specifications, coagulated, were not commercially viable, and had to be disposed of.

79.     On or about early October or November 2018, Cafe Agave notified Crown Valley in writing of the contractual breaches.  Crown Valley failed to resolve the issues within a reasonable period of time.

80.     As a result of Crown Valley's actions and omissions, the products it produced for Cafe Agave were unusable, unsellable, defective, and had to be removed from the market and destroyed.

81.     As a direct and proximate result of Crown Valley's breaches, including its willful, intentional and reckless breach of the Agreement, Cafe Agave was damaged.

## COUNT V

### (Breach of Express Warranty)

82.     Cafe Agave repeats, realleges, and incorporates by reference, each and every allegation, averment outlined in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

83.     Section 11(b) of the Agreement contains express warranties by Crown Valley that it would produce and package Cafe Agave's products in material accordance with Cafe Agave's specifications, that it would follow good manufacturing practices in the production of the

beverages and that it would produce Cafe Agave's products in material accordance with all applicable laws and regulations dealing with the production, storage, distribution, and sale of products containing alcohol.

84.     Cafe Agave relied on these warranties and representations in entering into the Agreement with Crown Valley, placing purchase orders for the products, and providing payment to Crown Valley.  In addition, Cafe Agave provided Crown Valley with specifications for the Cold Spiked Brew beverages it purchased from Crown Valley.

85.     Crown Valley breached its express warranties by willfully, intentionally, and recklessly failing to produce and can the products for Cafe Agave in material accordance with the specifications furnished by Cafe Agave.

86.     Crown Valley further breached its express warranties by failing to follow good manufacturing practices and failing to comply with applicable laws and regulations in the production of the products in multiple ways, including, but not limited to, manufacturing Cafe Agave's product in a non-sterile environment and using non-sterile equipment.

87.     As a result of Crown Valley breaches of its express warranties, Crown Valley produced Cafe Agave's products in an unsanitary and non-sterile environment, the beverages became contaminated with known wine spoiler microorganisms while in Crown Valley's possession (including with microorganisms that had contaminated L&F's beverages), failed to meet Cafe Agave's specifications, coagulated, were not commercially viable, and had to be disposed of.

88.     Cafe Agave notified Crown Valley in writing of the breaches of express warranty as early as October or November 2018, and Crown Valley failed to resolve the issues within a reasonable period of time.

280914626v.1

89.     As a result of Crown Valley's actions and omissions, the products it produced for Cafe Agave were unusable, unsellable, defective, and had to be removed from the market and destroyed.

90.     As a direct and proximate result of Crown Valley's breaches of its express warranties, including its willful, intentional, and reckless breaches of its express warranties, Cafe Agave was damaged.

## COUNT VI

### (Breach of Implied Warranty of Good Faith)

91.     Cafe Agave repeats, realleges, and incorporates by reference, each and every allegation, averment outlined in this Complaint with the same force and effect as if the same were more fully set forth at length herein.

92.     Section 400.1-304 of the Missouri Uniform Commercial Code imposes a legal duty or obligation on a contractual party to exercise good faith to carry out the obligations and terms of a contractual agreement.

93.     Cafe Agave did all of the significant things that the contracts required it to do, including but not limited to providing Crown Valley with protocols, specifications, policies, and procedures that would permit Crown Valley to produce and can Cafe Agave's products such that they were not contaminated.

94.     Crown Valley willfully and intentionally breached its duty of good faith to Cafe Agave by exercising its discretion in a manner contrary to good faith and fair dealing, including but not limited to, concealing the presence of known contamination and continuing to can Cafe Agave's products after it learned the products were contaminated and that they were not in compliance with Cafe Agave's specifications.

280914626v.1

95.     Cafe Agave notified Crown Valley in writing of the breaches of warranty as early as October or November 2018.

96.     As a direct and proximate result of Crown Valley's breaches of its implied warranty of good faith, including its willful, intentional, and reckless breaches of its implied warranty of good faith, Cafe Agave was damaged.

## PRAYER

WHEREFORE, Cafe Agave prays for relief in an amount to be proven at trial, which includes the damages as set forth below, and for such other and further monetary and equitable relief as the Court deems fair and reasonable in the circumstances.

A.   On the First Cause of Action, Plaintiff prays this Court to enter judgment against Crown Valley upon Count I for Fraudulent Concealment and direct that Crown Valley pay actual damages to Plaintiff in an amount to be proven at trial exceeding Twenty Million Dollars ($20,000,000.00).  Plaintiff further prays that this Court find that the fraudulent concealment and conduct of Crown Valley was intentional, outrageous, and done with reckless indifference and disregard of the consequences to warrant the award of punitive damages in an amount to be proven at trial, plus interest, costs, reasonable attorney's fees, and other expenses incurred in the collection of such damages.

B.   On the Second Cause of Action, Plaintiff prays this Court to enter judgment against Crown Valley upon Count II for Negligence/Recklessness and direct that Crown Valley pay actual damages to Plaintiff in an amount to be proven at trial exceeding Twenty Million Dollars ($20,000,000.00).  Plaintiff further prays this Court find that the conduct of Crown Valley was done with reckless indifference and disregard of the consequences to warrant the award of

punitive damages in an amount to be proven at trial, plus interest, costs, reasonable attorney's fees, and other expenses incurred in the collection of such damages.

C.   On the Third Cause of Action, Plaintiff prays this Court to enter judgment against Crown Valley upon Count III for Fraudulent Inducement and direct Defendant to pay actual damages to Plaintiff in an amount to be proven at trial exceeding Twenty Million Dollars ($20,000,000.00).  Plaintiff further prays this Court find that the conduct of Crown Valley was intentional, outrageous and done with reckless indifference and disregard of the consequences to warrant the award of punitive damages in an amount to be proven at trial, plus interest, costs, reasonable attorney's fees, and other expenses incurred in the collection of such damages.

D.   On the Fourth Cause of Action, Plaintiff prays this Court to enter judgment against Crown Valley upon Count IV for Breach of Contract and direct that Crown Valley pay actual damages to Plaintiff in an amount to be proven at trial exceeding Twenty Million Dollars ($20,000,000.00).   Plaintiff further prays this Court to enter its Order awarding costs, reasonable attorney's fees, and other expenses incurred in collecting such damages.

E.   On the Fifth Cause of Action, Plaintiff prays this Court to enter judgment against Crown Valley upon Count V for Breach of Express Warranty and direct that Crown Valley pay actual damages to Plaintiff in an amount to be proven at trial exceeding Twenty Million Dollars ($20,000,000.00).  Plaintiff further prays this Court to enter its Order awarding costs, reasonable attorney's fees, and other expenses incurred in collecting such damages.

F.   On the Sixth Cause of Action, Plaintiff prays this Court to enter judgment against Crown Valley upon Count VI for Breach of Implied Warranty of Good Faith and direct that Crown Valley pay actual damages to Plaintiff in an amount to be proven at trial exceeding Twenty Million Dollars ($20,000,000.00).  Plaintiff further prays this Court to enter its Order

24

awarding costs, reasonable attorney's fees, and other expenses incurred in collecting such damages.

## DEMAND FOR JURY TRIAL

Cafe Agave demands a jury trial in this matter.


Dated: March 13, 2023                    Respectfully submitted,


                                         /s/: *Daniel E. Tranen*
                                         Daniel E. Tranen, MO 48585
                                         WILSON ELSER MOSKOWITZ EDELMAN
                                         & DICKER LLP
                                         7777 Bonhomme Ave.
                                         Suite 1900
                                         St. Louis, MO 63105
                                         P: (314) 930-2860
                                         F: (314) 930-2861
                                         daniel.tranen@wilsonelser.com


                                         *Attorneys for Plaintiff*




## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served via the Court's electronic filing system, on this 13th day of March 2023, to all counsel of record.


                                         /s/ *Daniel E. Tranen*

280914626v.1